[Cite as *State v. Clark*, 2015-Ohio-5082.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

      Plaintiff-Appellee,               :               No. 15AP-135
                                                                          (C.P.C. No. 14CR-531)
v.                                               :
                                                                 (REGULAR CALENDAR)
Carlos C. Clark,                                 :

      Defendant-Appellant.              :

---

D E C I S I O N

Rendered on December 8, 2015

---

*Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Pritchard*, for appellee.

*Todd W. Barstow*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas.

BROWN, P.J.

{¶ 1} This is an appeal by defendant-appellant, Carlos C. Clark, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of kidnapping, aggravated burglary, and rape.

{¶ 2} On January 31, 2014, appellant was indicted on one count of kidnapping, in violation of R.C. 2905.01, one count of aggravated burglary, in violation of R.C. 2911.11, and one count of rape, in violation of R.C. 2907.02. The matter came for trial before a jury beginning December 16, 2014.

{¶ 3} The first witness for the state was Columbus Police Officer Nicholas Thatcher. On January 20, 2014, at 12:39 a.m., Officer Thatcher and his partner were dispatched to an apartment on Spiros Court, Galloway. The dispatch reported "a female caller on the phone saying that her ex-boyfriend had broke into the residence and was chasing her." (Tr. 54.) The front door of the apartment was open, and the officers observed two young children inside. The officers then made contact with the female caller, K.W., who was "[c]rying, scared, hysterical, out of breath." (Tr. 56.) Officer Thatcher obtained a statement from K.W. and then contacted police detectives.

{¶ 4} On January 20, 2014, at 12:57 a.m., Ronald Estepp, a member of the Columbus Fire Department, was dispatched to Spiros Court. Estepp prepared a written incident report in which he noted: "Patient stated she was raped by Carlos Cornelius Clark. Transported to Doctors West." (Tr. 68.) The report indicated that K.W. was "achy and anxious, and that she was shaking." (Tr. 69.) Medical personnel transported K.W. to Doctors Hospital.

{¶ 5} A.D. is the brother of K.W. On January 20, 2014, A.D. resided at an apartment on Erika Court, Galloway, in an apartment located near K.W.'s residence. On that date, K.W. "come beating on my door screaming." (Tr. 78.) A.D. opened the door, and K.W. "told me what happened and everything, so we called the police." (Tr. 78.) K.W. "was barefoot. She was scared out of her mind. I've really never seen her that scared before." (Tr. 79.) K.W. said: "Bub, help me. He's chasing me. He's going to get me. He's right behind me." (Tr. 80.) A.D. called 911, and K.W. "was trying to call 911 too." (Tr. 79.) K.W. had "left the children" at her residence, and "she didn't know what to do." (Tr. 81.) Several minutes later, a dispatcher informed them that police officers had arrived at K.W.'s residence. K.W. then returned to her apartment, accompanied by A.D. At trial, the state played a recording of the 911 call.

{¶ 6} K.W., age 23, has a son, age 7, and a daughter, age 2. Appellant is K.W.'s former boyfriend; they dated from 2011 until December 2013, when K.W. "broke up with him." (Tr. 88.) She described the relationship as "on again/off again." (Tr. 88.)

{¶ 7} On January 20, 2014, K.W. resided on Spiros Court, Galloway. On that date, K.W. had just put her son to bed when she heard a noise. She looked outside, but did not see anything. K.W. testified that she started to "get up, and before I could even

make it to my bedroom door, [appellant] was already standing in the middle of my bedroom proceeding to tell me that I was his and where's the guy that's hiding in here, and I proceeded to tell him there's no man." (Tr. 90.) Appellant said to K.W.: "Bitch, don't move. I'm going to check." (Tr. 91.) Appellant then "searched, ransacked my house." (Tr. 91.)

{¶ 8} K.W. remained in the bedroom; she "stood there and didn't move, as he told me to, because I didn't want him to hurt me." (Tr. 92.) Appellant then came upstairs and told K.W. that she "was lucky." (Tr. 92.) K.W. testified that appellant "grabbed me by my hair, and took me to the bathroom." (Tr. 92.) Appellant closed the bathroom door and "proceeded to take advantage of me when I told him I didn't want to." (Tr. 92.) He "tried to get me to do oral, and I wasn't doing it." (Tr. 92.) Appellant "hit me a couple of times, and then told me to turn around and placed me over the bathroom sink, and he ripped my pants down." (Tr. 92-93.) Appellant was "squeezing my neck" and "would squeeze harder when I would tell him that I don't want to and try to pull my pants up." (Tr. 93.) He "squeezed really hard and said, So you're saying that I'm raping you?" (Tr. 93.) Appellant said: "Go ahead. Say it. Say that I'm raping you, Bitch, so that I can kill you. Go ahead." (Tr. 93.) K.W. responded to appellant: "That's not what I'm saying. What I'm saying is I don't want to do this, Carlos. Get off me." (Tr. 93.) Appellant told K.W. "I was his. If he couldn't have me, no one could." (Tr. 93.) Appellant "proceeded to tell me that I wasn't moving until he ejaculated." (Tr. 95.) K.W. testified that, during the incident, appellant's penis "went in my vagina and my anus," and he ejaculated. (Tr. 95-96.)

{¶ 9} Appellant handed K.W. a rag and "tells me to clean up at the sink. He cleans up in my bathtub, and then he says, Bitch, go downstairs." (Tr. 97.) K.W. told appellant she wanted a cigarette. Appellant asked for a cigarette, and K.W. said she had only one but that she would share it with him. K.W. went to her bedroom and grabbed two phones to hide inside her clothing.

{¶ 10} K.W. then came downstairs and appellant "calls * * * out my name, and says, You haven't lit the cigarette yet?" (Tr. 99.) K.W. told appellant that her lighters "stay up on top of the shelf by the stove in the kitchen." (Tr. 99.) K.W. walked over toward the shelf "to reach for it, and that's when he tries to push me into hot grease that was on my stove." (Tr. 99-100.) Appellant had a knife and put it to K.W.'s throat.

Appellant "said he was going to slice my throat and let my 6 year old find me like that." (Tr. 101.)  Appellant "kept hitting me, and all I was doing was blocking him.  We fell over the kitchen table, couple things fell off the counter, and then we ended up on the floor." (Tr. 101-02.)  K.W. sat on the floor with her knees close to her chest.  Appellant "kept hitting me with a knife, and that's when he was threatening me, again."  (Tr. 102.)

{¶ 11} K.W. asked appellant: "Why are you doing this to me?"  (Tr. 102-03.) Appellant eventually "put the knife up and * * * laid backwards onto my dining room/kitchen floor."  (Tr. 103.)  K.W. saw this as her "opportunity to jump up and run, and that's what I did."  (Tr. 103.) She ran "[o]utside where some neighbors were."  (Tr. 103.)  Appellant chased after K.W. and told her: "Bitch, you're dead.  Anybody you gets dead.  I don't care when it is.  You are all going down."  (Tr. 104.)  K.W. then ran to her brother's residence, located nearby, and called 911.

{¶ 12} K.W. returned to her residence after police officers responded.  An ambulance arrived and transported her to the hospital.  Shortly after the incident, appellant "still proceeded to call and text my phone."  (Tr. 106.)  Appellant "was * * * texting, telling me he loves me; he's sorry; he don't know what he was thinking; please forgive him; I better not tell nobody; if I do, I better not go to court; so forth."  (Tr. 106.) K.W. testified that she sustained a bruise on her foot, as well as bruises on her legs and side during the incident; she also received scratches on her thighs, and marks on her neck and face.

{¶ 13} Ashley Russell, a registered nurse employed by Doctors Hospital, conducted an examination of K.W. on January 20, 2014; Russell noted "bruising and points of tenderness * * * to [K.W.'s] neck, her head, the back of her scalp."  (Tr. 196.)  Russell also noted "bruising on her right wrist, two small scratches to her right back, abrasion on her leg, her left leg, and bruising to her right leg."  (Tr. 196.)  Hospital personnel took photographs of K.W. At trial, the state introduced photographs of K.W. and her residence.

{¶ 14} On January 20, 2014, Columbus Police Detective Eric Poliseno interviewed K.W. at the hospital.  Detective Poliseno and his partner subsequently collected evidence at K.W.'s residence, including washcloths from the bathroom.  The detectives submitted the washcloths to the Bureau of Criminal Identification and Investigation ("BCI") to test

for DNA evidence; they also collected a rape kit from the hospital and submitted it to BCI with a laboratory request.

{¶ 15} At trial, Sarah Glass, a forensic scientist with BCI, identified items from a sexual assault evidence collection kit, including vaginal samples, several washcloths, and an oral swab taken from appellant. Glass testified that she identified the presence of semen on the vaginal samples; one of the washcloths also testified positive for semen. Glass forwarded the results to BCI for DNA testing.

{¶ 16} Hallie Garofalo, a forensic scientist with BCI, testified that the DNA profile from the vaginal swabs resulted in two DNA profiles; "one being consistent with [K.W.], the other * * * consistent with Carlos Clark." (Tr. 285.) Testing of the washcloth indicated a DNA profile consistent with appellant's DNA.

{¶ 17} Appellant, age 23, has two prior felony convictions for possession and receiving stolen property. Appellant testified on his own behalf, and gave the following account as to the events at issue. Appellant and K.W. first met when they were both employed at a warehouse. They eventually started dating, and appellant was living at K.W.'s residence until "around January 17th" 2014. (Tr. 305.)

{¶ 18} On the evening of January 18, 2014, appellant was at K.W.'s residence. Appellant woke up on K.W.'s couch the morning of January 19, 2014. He and K.W. "had got into an argument the previous day because of my infidelities and women calling my phone." (Tr. 307.) K.W. came downstairs and appellant made coffee. They began talking about their relationship, "and if we were going to be together." (Tr. 307.) Appellant "told her I loved her and that these other women are just other women, and we made up." (Tr. 307-08.) Appellant "told her I wanted to marry her, and actually we made up, and we had sex, wiped off." (Tr. 308.)

{¶ 19} Appellant later "received a call from one of my other females," and he and K.W. "ended up getting into another argument about that." (Tr. 308.) Appellant left K.W.'s residence and obtained a ride from a friend; they drove to "the Hilltop." (Tr. 308.) Appellant was "at the Hilltop, relaxing, hanging out with a few buddies. I ended up getting a call from my girlfriend at the time." (Tr. 308.) Appellant's girlfriend, later identified as Melinda Fee, "comes and picks me up, and we go to her cousin's house. We relax over there. She decides to get my name tattooed on her left breast. She gets my

name tattooed on her left breast and put it on Facebook." (Tr. 308.) According to appellant, his girlfriend obtained the tattoo between 9:00 and 10:00 p.m. on January 19, 2014. Appellant denied forcing K.W. to have sex with him. He also denied hitting K.W., entering her apartment without permission, or ransacking the apartment.

{¶ 20} On cross-examination, appellant stated that he broke off the relationship with K.W. in December 2013. Appellant began dating Fee in October 2013. He denied contacting K.W. after the alleged incident. At trial, the prosecutor showed appellant a printout containing his prison PIN code and a telephone log. Appellant acknowledged telling police officers during an interview that he did not leave his cousin's residence on the evening of January 19, 2014. When the police questioned appellant about the last time he had seen K.W., appellant told them "we broke up on the 17th." (Tr. 335.)

{¶ 21} The state called Fee as a rebuttal witness. Fee testified that she dated appellant from November 2013 to January 2014. On February 19, 2014, at approximately 1:00 p.m., Fee picked up appellant "on the Hilltop" and they drove to the apartment of Fee's cousin near Norton Road. (Tr. 350.) Around midnight, appellant left the apartment; he told Fee "he was going to go find my cousin." (Tr. 351.) Appellant was gone "[a]bout 25 minutes." When he returned, appellant "was out of breath like he was running." (Tr. 351.) Fee asked appellant "where he went, and he * * * lied to me." (Tr. 351.) Fee testified that appellant "didn't go look for my cousin, that he went over to that girl's house and * * * was over there with her for that little bit of time and then came back." (Tr. 351-52.) Fee stated that appellant "told me that he was over there, that he had went over there." (Tr. 355.)

{¶ 22} Following deliberations, the jury returned verdicts finding appellant guilty of rape, aggravated burglary, and kidnapping. The trial court conducted a sentencing hearing on January 22, 2015. The trial court subsequently filed an entry sentencing appellant to five years incarceration on Count 1, five years incarceration on Count 2, and eight years incarceration on Count 3, with Counts 1 and 2 to be served concurrently to each other, and Counts 2 and 3 to be served consecutively to each other, for a total sentence of 13 years incarceration.

{¶ 23} On appeal, appellant sets forth the following two assignments of error for this court's review:

I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF KIDNAPPING; AGGRAVATED BURGLARY AND RAPE AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY IMPROPERLY SENTENCING HIM TO CONSECUTIVE TERMS OF INCARCERATION IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES.

{¶ 24} Under the first assignment of error, appellant contends his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. We note that appellant does not separately argue his sufficiency and manifest weight claims; the focus of his argument, however, challenges the credibility of K.W.'s testimony.

{¶ 25} In *State v. Martin*, 10th Dist. No. 14AP-189, 2014-Ohio-4447, ¶ 19-20, this court discussed the distinction between sufficiency and manifest weight claims as follows:

> In reviewing the "record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "
>
> In contrast to a sufficiency argument, a reviewing court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact." Rather, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

(Citations omitted.)

{¶ 26} As indicated, the jury returned verdicts finding appellant guilty of kidnapping, aggravated burglary, and rape. R.C. 2905.01(A) defines the offense of kidnapping, in part, as follows:

No person, by force, threat, or deception * * * shall * * * restrain the liberty of [another], for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter;

(3) To terrorize, or to inflict serious physical harm on the victim or another;

(4) To engage in sexual activity * * * with the victim against the victim's will.

{¶ 27} R.C. 2911.11(A) sets forth the elements of the offense of aggravated burglary, and states, in part:

No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

(1) The offender inflicts, or attempts or threatens to inflict physical harm on another.

{¶ 28} R.C. 2907.02(A)(2) defines the offense of rape as follows: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶ 29} We first consider appellant's sufficiency of the evidence challenge. At trial, the state presented evidence that K.W., while inside her residence on January 20, 2014, heard a noise. She looked outside, but did not see anything. As K.W. started to walk toward her bedroom door, appellant was "standing in the middle of [her] bedroom," and he began accusing her of hiding another man in the residence. (Tr. 90.) Appellant ordered K.W. not to move, and he then "searched, ransacked [her] house." (Tr. 91.) K.W. testified that he "was opening up my closet doors, throwing a couple things out, moving my stuff around, looking around for another man." (Tr. 141.)

{¶ 30} Appellant then returned to the bedroom, grabbed K.W. by the hair and took [her] to the bathroom. Appellant closed the bathroom door and "proceeded to take advantage of" her. (Tr. 92.) Appellant "hit [K.W.] a couple of times," and then turned her around and placed her "over the bathroom sink," and he "ripped [her] pants down." (Tr. 93.) Appellant told K.W. that she "wasn't moving until he ejaculated." (Tr. 95.) K.W. testified that, during the incident, appellant's penis "went in my vagina and my anus," and that he ejaculated. (Tr. 95-96.) Appellant cleaned up in the bathroom using washcloths that were subsequently collected as evidence.

{¶ 31} K.W. then came downstairs to the kitchen; as she was reaching up near the stove to get a cigarette lighter, appellant attempted to "push [her] into hot grease that was on [the] stove." (Tr. 100.) Appellant put a knife to K.W.'s throat, and threatened to "slice" her throat. (Tr. 101.) Appellant began hitting K.W., and they fell over a kitchen table to the ground. Appellant continued to hit K.W. and threaten her. K.W. was eventually able to flee her residence, and she ran to her brother's apartment.

{¶ 32} Upon review of the record, and construing the evidence most strongly in favor of the prosecution as we are required to do in considering a sufficiency challenge, the evidence submitted by the state, including the testimony of K.W., if believed, was sufficient to support the elements of rape, aggravated burglary, and kidnapping beyond a reasonable doubt. Accordingly, we reject appellant's sufficiency challenge.

{¶ 33} Appellant also contends his convictions were against the manifest weight of the evidence. As noted above, appellant primarily challenges the credibility of K.W.'s testimony. Appellant maintains that, despite K.W.'s testimony that he viciously assaulted her, photographs taken of K.W. at the hospital fail to show corresponding injuries. Appellant also argues that photographs of K.W.'s residence showed no signs of a brutal attack, and appellant notes that K.W. testified she moved items of evidence in the residence at the direction of police officers and detectives.

{¶ 34} At trial, K.W. testified that she sustained bruises to her foot, legs and side, as well as scratches on her thighs, and marks on her neck and face, as a result of the assault. While appellant contends that photographs of K.W. introduced at trial did not match the injuries alleged by K.W., the state also presented the testimony of Ashley Russell, a registered nurse at Doctors Hospital, who participated in an examination of

K.W. shortly after the incident.  Russell noted "bruising and points of tenderness * * * to [K.W.'s] neck, her head, the back of her scalp," as well as "bruising on her right wrist, two small scratches to her right back, abrasion on her leg, her left leg, and bruising to her right leg."  (Tr. 196.)  During closing argument, defense counsel argued before the jury that any bruising depicted in the photographs was inconsistent with the offenses alleged.  The jury, however, was free to consider the photographs and to believe or disbelieve the testimony of the witnesses, including the nurse who examined K.W. shortly after the incident.  The trier of fact obviously found credible the testimony of K.W. and/or Russell.

{¶ 35} With respect to appellant's claim that K.W. moved items of evidence in the apartment at the direction of police personnel, K.W. testified, during cross-examination, that "[w]hen the police got there * * * I moved the oil, with the police's consent, because the thing was still hot and my children was in the house."  (Tr. 128.)  K.W. explained that "[t]hey told me to move the grease off of the hot burner."  (Tr. 130.)

{¶ 36} Under Ohio law, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.  Further, a criminal defendant "is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." *State v. Timmons*, 10th Dist. No. 04AP-840, 2005-Ohio-3991, ¶ 10.  Here, the trier of fact was in the best position to assess the credibility of K.W.'s testimony, and the jury obviously found any inconsistencies to be immaterial.  Upon review, we find that the verdicts were not against the manifest weight of the evidence, and the jury did not lose its way and create a manifest miscarriage of justice.

{¶ 37} Based upon the foregoing, appellant's first assignment of error is without merit and is overruled.

{¶ 38} Under the second assignment of error, appellant contends the trial court erred in imposing consecutive sentences by failing to comply with the requirements of R.C. 2929.14(C)(4).  Specifically, appellant argues that the trial court failed to make a finding that consecutive sentences were not disproportionate to the danger he posed to the public.

{¶ 39} R.C. 2929.14(C)(4) states, as follows:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a)  The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b)  At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c)  The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 40} In *State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, syllabus, the Supreme Court of Ohio recently held: "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings."

{¶ 41} A review of the transcript of the sentencing hearing in the instant case indicates the trial court stated that consecutive sentences were necessary to punish the offender, and that consecutive sentences were not disproportionate to the offense and the conduct at issue in the case.  The court also noted that appellant was under community control at the time of the offense.  As argued by appellant, the trial court did not specifically state during the sentencing hearing that consecutive sentences were not disproportionate "to the danger the offender poses to the public."  In *Bonnell,* however,

the Supreme Court held that a trial court is not "required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id.* at ¶ 37.

{¶ 42} In *State v. Hargrove,* 10th Dist. No. 15AP-102, 2015-Ohio-3125, ¶ 15, this court considered a similar contention, i.e., that the trial court had failed to comply with R.C. 2929.14(C)(4) by failing to find "that 'consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public.' "  This court observed that "relevant case law shows that appellate courts have been fairly deferential to the trial court when reviewing the transcript of a sentencing hearing to determine whether the trial court has made the findings required by R.C. 2929.14(C)(4)." *Id.* at ¶ 19.  By way of example, we cited *State v. Hillman,* 10th Dist. No. 14AP-252, 2014-Ohio-5760, in which "this court held that statements by the trial court that defendant's criminal conduct 'shows a very serious disregard for people's safety' and that there were 'several different victims' shows that the trial court made the second required finding under R.C. 2929.14(C)(4)." *Hargrove* at ¶ 19, quoting *Hillman* at ¶ 68. In reviewing the record in *Hargrove,* this court found the trial court's statements during the sentencing hearing, including the court's observation that the appellant had previously been convicted of a similar crime, permitted this court to find "that the trial court found not only that consecutive service is necessary to punish appellant but also that consecutive service is not disproportionate to the danger appellant poses to the public." *Id.* at ¶ 18.

{¶ 43} In the present case, while the trial court did not expressly recite the statutory language with respect to the second finding, we find that the record is sufficient for this court to conclude that the court made the necessary findings.  Specifically, during the sentencing hearing, the court expressed "concern" about appellant's "prior conduct," including the fact he had previously engaged in similar "assaultive-type behavior."  (Tr. Jan. 22, 2015, 18.)  The court also noted on the record that appellant's prior behavior "demonstrates that consecutive sentences are necessary in this matter."  (Tr. Jan. 22, 2015, 19.)  Further, the trial court incorporated the findings into the judgment entry. Thus, while the court "did not employ the precise statutory language in making its findings in support of a consecutive sentence," the trial court's "commentary at the

sentencing hearing demonstrates that it did make the findings required by R.C. 2929.14(C)(4)." *Hillman* at ¶ 70.

{¶ 44} Accordingly, appellant's second assignment of error is not well-taken and is overruled.

{¶ 45} Based upon the foregoing, appellant's first and second assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

SADLER and HORTON, JJ., concur.

_____